**CASE NO. 22-1703**

## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

---

RYAN G. CARTER; KATHLEEN E. COLE,

*Plaintiffs - Appellants,*

v.

UNITED STATES OF AMERICA,

*Defendant - Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT BALTIMORE

---

**OPENING BRIEF OF APPELLANT**

---

Brian S. Brown
Christopher T. Casciano
Kristin R. Hosseinzadeh
Alexis I. Gbemudu
BROWN & BARRON, LLC
7 Saint Paul Street, Suite 800
Baltimore, MD 21202
410-547-0202

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 22-1703        Caption: Ryan G. Carter; Kathleen E. Cole v. United States of America

Pursuant to FRAP 26.1 and Local Rule 26.1,

Ryan G. Carter
(name of party/amicus)


who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.   Does party/amicus have any parent corporations?   ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:




3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                     ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Christopher T. Casciano, Esquire          Date:  07/12/2022

Counsel for: Ryan G. Carter

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _22-1703_        Caption: _Ryan G. Carter; Kathleen E. Cole v. United States of America_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Kathleen E. Cole_
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
     If yes, identify all parent corporations, including all generations of parent corporations:




3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
     other publicly held entity?                                                  ☐ YES ☑ NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)        ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?        ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Christopher T. Casciano, Esquire            Date:      07/12/2022

Counsel for: Kathleen E. Cole

Print to PDF for Filing

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES....................................................................iii

STATEMENT OF JURISDICTION..........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................1

STATEMENT OF THE CASE ................................................................1

SUMMARY OF THE ARGUMENT ........................................................7

ARGUMENT .......................................................................................12

    A.    Standard of Review ..................................................................12

    B.    Appellants' Congressionally Authorized Medical Negligence Claims Fall Squarely Within the Confines of the Federal Tort Claims Act....................................................12

        1. Appellants' Civil Claims Are Wholly Consistent With a Historical and Plain Meaning Analysis of the FTCA...........13

    C.    The *Feres* Doctrine Does Not Apply to Appellants' FTCA Claims .................................................................................21

        1. Mr. Carter's Claims and Injuries Were Not Incident to Service as He Was Inactive Duty and Under Compulsion of No Orders While Undergoing an Elective Surgical Procedure at a Government Hospital ...................................28

        2. Mr. Carter was an Inactive Duty Reservist Injured Off-Base, While Unconscious Under General Anesthesia for an Elective Surgery............................................................32

D.   The Rationales Underpinning the *Feres* Doctrine and the Incident to Service Test Have Been Discarded by the Supreme Court and Do Not Apply to Appellants' Claims ........ 35

1. The "Distinctively Federal Relationship" Rationale Has Been Discarded by the Courts and No Longer Controls ...... 35

2. Mr. Carter Benefits From No "Grand Bargain." .................. 37

3. Only One Legitimate *Feres* Rationale Remains: The Evolution and Refinement of the *Feres* Rationales and the *Post Hoc* Rationalization of Military Discipline............ 39

4. Appellants' Medical Negligence Claims Do Not Impute Military Discipline ............................................................... 41

E.   *Feres* Was Wrongfully Decided and Should Be Overruled....... 45

CONCLUSION ........................................................................................ 47

STATEMENT IN SUPPORT OF ORAL ARGUMENT .......................... 47

CERTIFICATE OF COMPLIANCE....................................................... 48

# TABLE OF AUTHORITIES

## Cases

*Aikens v. Ingram*,
  811 F.3d 643 (4th Cir. 2016) ...................................................... 28, 33

*Appelhans v. United States*,
  877 F.2d 309 (4th Cir. 1989) ...................................................... 25, 46

*Balfour Beatty Infrastructure, Inc. v. Mayor & City Council of Balt.*,
  855 F.3d 247 (4th Cir. 2017) ........................................................... 12

*BedRoc Ltd., LLC v. United States*,
  541 U.S. 176 (2004) .................................................................... 14-15

*Bosh v. United States*,
  CASE NO. C19-5616 BHS, 2019 WL 6728636 (W.D. Wash.
  Dec. 11, 2019), *aff'd*, 831 F. App'x 834 (9th Cir. 2020) ..................... 26

*Bozeman v. United States*,
  780 F.2d 198 (2d Cir. 1985) ............................................................. 25

*Bradley v. United States*,
  161 F.3d 777 (4th Cir. 1998) ...................................................... 34, 44

*Brooks v. United States*,
  337 U.S. 49 (1949) .................................................. 19, 20, 21, 27, 38

*Chappell v. Wallace*,
  462 U.S. 296 (1983) .................................................................. 40, 47

*Cioca v. Rumsfeld*,
  720 F.3d 505 (4th Cir. 2013) ........................................................... 42

*Clendening v. United States*,
  19 F.4th 421 (4th Cir. 2021) ...................................................... *passim*

*Connecticut Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) ........................................................................ 15

*Cortez v. United States*,
  854 F.2d 723 (5th Cir. 1988) ...................................................... 34, 44

*Cummings v. Dep't of Navy*,
  116 F. Supp. 2d 76 (D.D.C. 2000), *rev'd sub nom.,* 279 F.3d 1051
  (D.C. Cir. 2002) .................................................................... 26

*Daniel v. United States*,
  139 S. Ct. 1713 (2019) ................................................. 11, 45

*Davis v. United States*,
  667 F.2d 822 (9th Cir. 1982) .......................................... 35

*Dobbs v. Jackson Women's Health Organization*,
  142 S. Ct. 2228 (2022) ..................................................... 46

*Feres v. United States*,
  340 U.S. 135 (1950) ................................................. *passim*

*Fianko v. United States*,
  No. PWG-12-2025, 2013 WL 3873226 (D. Md. July 24 2013) .......... 26

*Frankel v. United States*,
  810 F. App'x 176 (4th Cir. 2020) .................................... 12

*Gray v. Bell*,
  712 F.2d 490 (D.C. Cir. 1983) ........................................ 18

*Hass v. United States*,
  518 F.2d 1138 (4th Cir. 1975) ........................................ 30

*Hillman v. IRS*,
  263 F.3d 338 (4th Cir. 2001) .......................................... 14

*Hunt v. United States*,
  636 F.2d 580 (D.C. Cir. 1980) ............................... 35, 41, 43

*In re Sunterra Corp. (RCI Tech. Corp. v. Sunterra Corp.)*,
  361 F.3d 257 (4th Cir. 2004) .......................................... 14

*Jaffee v. United States*,
  663 F.2d 1226 (3d Cir. 1981) ...................................... 42, 43

*Kendrick v. United States*,
  877 F.2d 1201 (4th Cir. 1989) ........................................ 28

iv

*Kimble v. Marvel Ent., LLC*,
   135 S. Ct. 2401 (2015) ....................................................................... 46

*Labash v. U.S. Dep't of Army*,
   668 F.2d 1153 (10th Cir. 1982) ........................................................ 25

*Lewis v. United States*,
   663 F.2d 889 (9th Cir. 1981) ............................................................ 35

*Loumiet v. United States*,
   828 F.3d 935 (D.C. Cir. 2016) ........................................................... 17

*Perez v. Puerto Rico Nat. Guard*,
   951 F. Supp. 2d 279 (D.P.R. 2013) ................................................... 25

*Scales v. United States*,
   685 F.2d 970 (5th Cir. 1982), *cert. denied,* 460 U.S. 1082 (1983) .... 41

*Siddiqui v. United States*,
   No. 17-13351, 2018 WL 6178983 (E.D. Mich. Nov. 27, 2018),
   *aff'd,* 783 F. App'x 484 (6th Cir. 2019) ............................................ 26

*Smith v. Saraf,*
   148 F. Supp. 2d 504 (D.N.J. 2001) ................................................... 26

*Stencel Aero Engineering Corp. v. United States*,
   431 U.S. 666 (1977) ............................................................ 35, 42, 43

*United States v. Brown*,
   348 U.S. 110 (1954) ............................................................... *passim*

*United States v. Johnson*,
   481 U.S. 681 (1987) ............................................................... *passim*

*United States v. Muniz*,
   374 U.S. 150 (1963) .................................................................. 36, 40

*United States v. Shearer*,
   473 U.S. 52 (1985) ................................................................... 36, 40

## Statutes

10 U.S.C. § 12301 ................................................................. 2, 5

25 U.S.C. § 5321 ..................................................................... 17

28 U.S.C. § 1291 ....................................................................... 1

28 U.S.C. § 1346 ................................................... 1, 16, 17, 36

28 U.S.C. § 2401 ..................................................................... 17

28 U.S.C. § 2671 ....................................................................... 7

28 U.S.C. § 2675 ....................................................................... 6

28 U.S.C. § 2680 ................................................... 12, 16, 18

32 U.S.C. § 502 ................................................................. 32, 43

38 U.S.C. § 101 ................................................................. 32, 43

38 U.S.C. § 301 ....................................................................... 22

38 U.S.C. §§ 316, 502 ............................................................ 32

38 U.S.C. §§ 2671-2680 ......................................................... 17

42 U.S.C. § 233 ....................................................................... 17

## Other Authorities

Congressional Research Inst., *Workers' Compensation: Overview and Issues*
https://sgp.fas.org/crs/misc/R44580.pdf (Feb. 18, 2020) .................... 23

Dana Montalto, *Op. Ed.: How the VA has Illegally Denied Healthcare to Thousands of Veterans,* Los Angeles Times
https://www.latimes.com/opinion/story/2021-05-31/veterans-healthcare-denied-access (May 13, 2021) ......................................... 39

E. Warren, *The Bill of Rights and the Military*,
37 N.Y.U. L. Rev. 181 (1962) ............................................................. 47

Eig, L. M., *Statutory Interpretation: General Principles and Recent Trends* (CRS Report No. 7-5700) (2014) ..................... 13, 14

Indian Health Service, Risk Management Manual,
The Federal Tort Claims Act, Section Seven ....................................... 17

Jennifer L. McMahan and Mimi Vollstedt, *Researching the Legislative History of the Federal Tort Claims Act*, United States Attorneys' Bulletin, Vol. 50 Number 1, 2011 ................ 18

Jill Castellano, *The Mission Act is Supposed to Help US Veterans Get Health Care Outside the VA. For Some, It's Not Working,* USA Today
https://www.usatoday.com/in-depth/news/investigations/2021/11/01/mission-act-aid-veterans-healthcare-va-isnt-letting-it/ (Nov. 1, 2021) ..................................... 39

Judy Woodruff, *Reports Highlight Failures of the VA's Health System During the Pandemic,* PBS News Hour
https://www.pbs.org/newshour/show/reports-highlight-failures-of-the-vas-health-system-during-the-pandemic (Jan. 1, 2021) ................... 39

Patricia Kime, *Leadership Hasn't Done Enough to Protect Patients at the VA, Watchdog Says, Military.com*
https://www.military.com/daily-news/2021/10/27/leadership-hasnt-done-enough-protect-patients-va-watchdog-says.html (Oct. 27, 2021) .......................................................................................... 39

Paul M. Sandler and James K. Archibald, Pleading Causes of Action in Maryland (2018) ................................................................................... 23

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1291. The district court had subject matter jurisdiction pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Did the District Court err in applying the *Feres* doctrine to Appellants' civil tort claims brought pursuant to the FTCA and, in turn, granting the government's motion to dismiss for lack of subject matter jurisdiction?

2.    Should *Feres* be overruled?

## STATEMENT OF THE CASE

At the time of the alleged medical negligence and his resulting catastrophic injuries on April 6, 2018, Ryan Carter was a 43-year-old inactive duty Air National Guard Staff Sergeant, and a civilian employee of the federal government. JA11; JA431. Mr. Carter was married to

Kathleen Cole.  JA8.  Pursuant to orders under 10 U.S.C. 12301(d)[1], Mr. Carter had just completed an active tour of duty with the Air Force beginning on August 27, 2017 and ending on March 13, 2018.  JA245; JA431.  Between March 14 and April 6, 2018, Mr. Carter was inactive duty and under compulsion of no military orders.  JA14; JA245-246; JA249; JA431-432, ¶¶7-10; JA480.  He was not serving on a military mission, nor was he engaged in military duties.

On April 6, 2018, due to a past medical history that included degenerative cervical disk disease, Mr. Carter presented to the Walter Reed National Military Medical Center in Bethesda, Maryland, for anterior cervical discectomy and fusion surgery in connection with a diagnosis of cervical spondylotic myelopathy. JA12.  There was nothing distinctively military about the surgery or the care provided to Mr. Carter on April 6, 2018.  Intraoperatively, Mr. Carter sustained injury to his

---

[1] 10 U.S.C. 12301(d) states as follows: "At any time, an authority designated by the Secretary concerned may order a member of a reserve component under his jurisdiction to active duty, or retain him on active duty, with the consent of that member. However, a member of the Army National Guard of the United States or the Air National Guard of the United States may not be ordered to active duty under this subsection without the consent of the governor or other appropriate authority of the State concerned."

2

cervical spinal cord during the negligent placement of a trial spacer at the C4/5 level of his spine. JA12: JA16. Following surgery, Mr. Carter was awoken from anesthesia and unable to move all four of his extremities. JA12. Mr. Carter underwent emergent reoperation that same day. JA12. Postoperatively, Mr. Carter was transferred to the ICU, intubated and sedated, with persistent motor and sensory deficits in all four extremities. JA12. Upon admission to the ICU, he was reported to have an ASIA A spinal[2] cord injury. JA12. In the hours and days that followed, Mr. Carter underwent examination and testing, including CT, MRI, and ultrasound imaging to determine the cause, nature, and extent of his diminished postoperative neurological function and pain. JA13.

---

[2] The extent of a spinal cord injury (SCI) is defined by the American Spinal Injury Association (ASIA) Impairment Scale using the following categories:

> A = Complete: No sensory or motor function is preserved in sacral segments S4-S5
> B = Incomplete: Sensory, but not motor, function is preserved below the neurologic level and extends through sacral segments S4-S5
> C = Incomplete: Motor function is preserved below the neurologic level, and most key muscles below the neurologic level have a muscle grade of less than 3
> D = Incomplete: Motor function is preserved below the neurologic level, and most key muscles below the neurologic level have a muscle grade that is greater than or equal to 3
> E = Normal: Sensory and motor functions are normal

3

Mr. Carter remained admitted to the Walter Reed SICU for approximately three weeks because of his spinal cord injury.  JA13.

On April 25, 2018, Mr. Carter was discharged from Walter Reed and transferred to the Hunter Holmes McGuire VA Medical Center in Richmond, Virginia for comprehensive spinal cord injury rehabilitation therapy.  JA13.  As a resident inpatient at the Hunter Holmes McGuire VA Medical Center, Mr. Carter required continued rehabilitation therapy due to his April 6, 2018 spinal cord injury, as well as ongoing treatment for his neurogenic bladder, neurogenic bowel, oropharyngeal dysphagia, pressure ulcers of the sacral and gluteal regions, spasticity, obstructive sleep apnea, obstruction of the pelvic-ureteric junction, adjustment disorder with mixed emotions, generalized anxiety disorder, and depression.  JA13.

On June 27, 2018, approximately 82 days after his April 6, 2018, surgical misadventure and resulting traumatic spinal cord injury, Ryan Carter's duty status was ***retroactively*** converted from inactive duty to

active duty by way of a 10 U.S.C. 12301(h)[3] Air National Guard Call to Duty Order, with a retroactive start date of March 14, 2018. JA14; JA249; JA432; JA451-452. This retroactive call to duty order was issued by Colonel Carbonell, Mr. Carter's commanding officer during his August 2017 to March 2018 active duty tour, when Colonel Carbonell "realized" that Mr. Carter "had received medical treatment after his active duty tour without having first obtained orders continuing active duty status for medical treatment. Thus, SSgt. Carter was ***not qualified*** to receive the sought [sic] medical treatment and care at Walter Reed" on April 6,

---

[3] 10 U.S.C. 12301(h) states as follows:
(1) When authorized by the Secretary of Defense, the Secretary of a military department may, with the consent of the member, order a member of a reserve component to active duty—
    (A) to receive authorized medical care;
    (B) to be medically evaluated for disability or other purposes; or
    (C) to complete a required Department of Defense health care study, which may include an associated medical evaluation of the member.
(2) A member ordered to active duty under this subsection may, with the member's consent, be retained on active duty, if the Secretary concerned considers it appropriate, for medical treatment for a condition associated with the study or evaluation, if that treatment of the member is otherwise authorized by law.
(3) A member of the Army National Guard of the United States or the Air National Guard of the United States may be ordered to active duty under this subsection only with the consent of the Governor or other appropriate authority of the State concerned.

2018. JA432, ¶10 (emphasis added). Stated otherwise, at the time of his April 6, 2018, spine surgery and traumatic cord injury, Mr. Carter was inactive, under compulsion of no military orders, on no military mission, and technically not qualified to receive treatment and care at the Walter Reed National Military Medical Center.

On April 8, 2019, Mr. Carter was discharged from the Hunter Holmes McGuire VA Medical Center and transferred to CareMeridian Nursing and Rehabilitation in Littleton, Colorado for continued spinal cord injury rehabilitation in a subacute setting. JA14. Concurrent with his transfer, Mr. Carter was enrolled in the VA Eastern Colorado Health Care System in Aurora, Colorado. JA14. In April 2021, Mr. Carter relocated with his wife to Tampa, Florida, where he continues to receive outpatient medical care and treatment, including rehabilitation therapy, through the James A. Haley Veterans' Hospital in Tampa, Florida, in connection with his tetraplegia and related injuries and damages. JA14.

Appellants, Ryan Carter and his wife, Kathleen Cole, complied with the provisions of 28 U.S.C. § 2675 of the FTCA. They each submitted timely administrative claims with the United States. JA10-11. Their claims were subsequently denied. JA11. Appellants filed a Complaint in

the District Court on May 27, 2021, pursuant to the FTCA, 28 U.S.C. §2671, *et seq.* JA7-25. On November 24, 2021, the United States moved to dismiss for lack of subject matter jurisdiction. JA250-269. Appellants responded in opposition on February 7, 2022. JA373-403. The United States replied on March 30, 2022. JA408-427. On March 24, 2022, the District Court, the Honorable Ellen L. Hollander, entered an order and judgment dismissing the case. JA455-502. Appellants timely filed a notice of appeal on June 28, 2022. JA503.

## SUMMARY OF THE ARGUMENT

*Feres* neither applies to, nor bars Appellants' congressionally authorized FTCA claims. On April 6, 2018, Appellant Ryan Carter, while not on active duty and under compulsion of no military orders, walked into the Walter Reed National Military Medical Center in Bethesda, Maryland, where he underwent an elective orthopaedic spine procedure to surgically correct a degenerative disc condition in his cervical spine that was negatively impacting his quality of life. Tragically, Ryan has not walked again since this fateful day, having suffered a traumatic and completely avoidable spinal cord injury caused by the negligent and tortious conduct of government healthcare providers. During the

7

placement of a trial spacer between the C4 and C5 disc spaces of his cervical spine, Ryan Carter's spinal cord was negligently struck and traumatized—an iatrogenic and permanent cervical spine injury that has left Ryan with little-to-no function in his bilateral upper and lower extremities.

Physically, Ryan Carter requires 24/7 assistance with all activities of daily living, including bathing, toileting, dressing, eating, and ambulating. Mentally and emotionally, Ryan is a shell of his former self, yearning for the life he had with his wife and family. Mr. Carter's independence and autonomy has been stolen from him and he struggles daily with the fear, stress, and anxiety caused by his dispiriting condition. Mr. Carter's life has been unaccountably turned on its head—all due to the negligent conduct of government health care providers.

As of the date of his fateful surgery on April 6, 2018, Mr. Carter was a 43-year-old inactive duty Air National Guard Staff Sergeant subject to no military orders—no active duty orders, no medical orders, nor any other orders. On April 6, 2018, Mr. Carter was not engaged in military duty or a military mission; he was inactive; his role was simply that of a patient seeking medical and surgical care from trained health care

professionals.   It was not until *after* his traumatic and permanent spinal cord injury that Mr. Carter's duty status was *retroactively* changed from inactive to active status.  The mere fact of this retroactive duty status change is dispositive and unequivocally removes Mr. Carter's claims from beneath the *Feres* umbrella.

The instant medical negligence civil matter, filed pursuant to the FTCA, does not involve any military exigencies, decisions, or considerations, does not intrude upon military affairs, nor will it have any impact whatsoever upon the military disciplinary structure.  Mr. Carter was not involved in the combatant activities of the military during time of war, nor were his April 6, 2018 injuries incident to service.  For all intents and purposes, Mr. Carter was an inactive duty serviceman entitled to all the healthcare benefits of a military veteran.  The rationales underpinning *Feres* simply do not apply here.  The *Feres* doctrine has no justification where a servicemember – active or inactive – is simply a patient, and the acts or omissions at issue are medical, not military, decisions.  Mr. Carter's permanent and traumatic injuries occurred, not because of any military exigencies or considerations, but because of the failure of Mr. Carter's doctors to follow and implement

basic standards of care, standards which are national in scope, and which should be followed by any healthcare provider, military or otherwise, in treating similarly situated surgical patients. The application of *Feres* to the facts of this case lacks justification and would do no more than license tortious conduct and mandate second-class citizenship for no legitimate reason.

In 2018, an otherwise healthy adult man – whether a member of the military, a veteran, or a civilian – should not be rendered permanently paralyzed by the negligent conduct of trained health care professionals. Under *Feres*, active duty military service members and their families receive arbitrarily disparate treatment under the law, as compared to their ex-military, veteran counterparts. If a similarly situated veteran had sustained comparable injuries at the Walter Reed National Military Medical Center or another government hospital, that individual could bring a civil tort claim against the United States for malpractice under the FTCA, for the same types of treatment and negligent conduct which occurred in the present case. The claim would involve the same proof, the same witnesses, and the same law, as in the present case.

10

Notwithstanding the clear inapplicability of *Feres* to Appellants'
claims, should the Court find that *Feres* applies in some way to the facts
of this case, which it wholeheartedly should not, Appellants respectfully
request that the Court inspect the underlying rationales and disparate
implications of *Feres* under a microscope and otherwise reconsider the
practicality and applicability of *Feres* given the decades of widespread,
universal criticism it has justly received. As Justice Thomas aptly noted:

> '*Feres* was wrongly decided and heartily deserves the
> widespread, almost universal criticism it has received'….
> Such unfortunate repercussions—denial of relief to military
> personnel and distortions of other areas of law to
> compensate—will continue to ripple through our
> jurisprudence as long as the Court refuses to reconsider *Feres*.
> Had Congress itself determined that servicemembers cannot
> recover for the negligence of the country they serve, the
> dismissal of their suits 'would (insofar as we are permitted to
> inquire into such things) be just'…. But it did not.

*Daniel v. United States*, 139 S.Ct. 1713 (2019) (Thomas, J., dissenting
from denial of certiorari) (internal citations omitted). For the reasons
detailed herein, and otherwise articulated in Justice Scalia's salient
dissent in *United States v. Johnson*, 481 U.S. 681, 693 (1987), *Feres*
should be overruled.

11

## ARGUMENT

### A.    Standard of Review

This Court reviews a district court's application of the *Feres* doctrine and dismissal for lack of subject matter jurisdiction *de novo*. *Frankel v. United States*, 810 F. Appx 176, 179 (4th Cir. 2020), citing *Balfour Beatty Infrastructure, Inc. v. Mayor & City Council of Balt.*, 855 F.3d 247, 251 (4th Cir. 2017).

### B.    Appellants' Congressionally Authorized Medical Negligence Claims Fall Squarely Within the Confines of the Federal Tort Claims Act.

The FTCA waives the historical immunity of the sovereign and authorizes tort actions against the Government for the negligence of its employees, while expressly retaining immunity only for "claim[s] arising out of the ***combatant activities*** of the military or naval forces, or the Coast Guard, ***during time of war***." 28 U.S.C. §2680(j) (emphasis added).

At the time of his elective surgery and resulting traumatic spinal cord injury on April 6, 2018, Mr. Carter's duty status was "inactive," and he was subject to no military orders, including no active-duty orders, no medical orders, nor any other orders. Implicitly, and even explicitly, at the time of his injury, Mr. Carter was not involved in the *combatant*

12

*activities of the military during time of war*, nor were his April 6, 2018, spinal cord injuries *incident to service* in any way. As of April 2018, Mr. Carter was, for all intents and purposes, a military veteran seeking surgical care from a government health care facility. Mr. Carter's civil tort claims are no different than the congressionally authorized medical negligence claims routinely asserted by military service veterans against government medical centers nationwide in accordance with the FTCA.

1.     **Appellants' Civil Claims Are Wholly Consistent With a Historical and Plain Meaning Analysis of the FTCA.**

The starting point in construing a statute is the plain language of the statute itself. The Supreme Court often recites the "plain meaning rule," that, if the language of the statute is plain and unambiguous, it must be applied according to its terms. Eig, L. M. (2014). *Statutory Interpretation: General Principles and Recent Trends* (CRS Report No. 7-5700) at 3. Under text-based analysis, the cardinal rule of construction is that the whole statute should be drawn upon as necessary, with its various parts being interpreted within their broader statutory context in a manner that furthers statutory purposes. *Id.* at 4. Justice Scalia, who was in the vanguard of efforts to redirect statutory construction toward statutory text and away from legislative history, has characterized this

13

general approach: "Statutory construction...is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *Id.*

Accordingly, a proper analysis of the FTCA requires an application of the principles of statutory interpretation. When interpreting a statute, courts begin with the text of the statute at issue. The Fourth Circuit has recognized that "as a settled principle, 'unless there is some ambiguity in the language of a statute, a court's analysis must end with the statute's plain language....'" *In re Sunterra Corp.*, 361 F.3d 257, 265 (4th Cir. 2004) (citing *Hillman v. I.R.S.*, 263 F.3d 338, 342 (4th Cir. 2001)). The court's analysis must end with the plain language because "[t]he preeminent canon of statutory interpretation requires [courts] to presume that the legislature says in a statute what it means and means in a statute what it says there." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992)) (alterations made).

Here, a simple plain meaning interpretation of the FTCA works in tandem with Congress in carrying out the statute's intended purpose, that is, to permit individuals like the Appellant Ryan Carter—civilian, veteran, and military alike—to pursue civil claims for personal injuries caused by the negligent or wrongful acts or omissions of any government employee while acting within the course and scope of his or her office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. The FTCA reads, in pertinent part, as follows:

> Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

15

The FTCA includes a detailed list of exceptions to its waiver of government immunity.  28 U.S.C. § 2680. We highlight two of these exceptions as not only relevant to the instant matter, but also as a clear and explicit example of the considerations and calculations made by Congress, demonstrating a clear legislative intent regarding the scope, breadth, and limitations of the FTCA. Section 2680 reads, in pertinent part, as follows:

> The provisions of this chapter and section 1346(b) of this title shall not apply to…
> (j) Any claim arising out of the **_combatant activities_** of the military or naval forces, or the Coast Guard, **_during time of war_**.
> (k) Any claim arising in a foreign country."

28 U.S.C. § 2680(j)-(k) (emphasis added).

Here, Congress enacted and codified specific exceptions to the FTCA's waiver of government immunity that contemplate the combatant activities of the military during time of war, as well as claims arising in a foreign country.  In so doing, Congress unequivocally excluded from the FTCA's waiver of immunity exceptions claims arising out of the *noncombatant activities of the military during times of peace*.

Interpreting the plain language of the FTCA requires an understanding of the landscape in which the statute sits and the context

16

in which it was created. Prior to 1946, the Federal Government could not be held liable for tortious activity based on the doctrine of sovereign immunity. Indian Health Service, Risk Management Manual, *The Federal Tort Claims Act*, Section Seven. (citing 28 U.S.C. §§ 1346(b), 2401(b), 2671-2680; 25 U.S.C. § 5321(d), 458aaa-15; 42 U.S.C. § 233). With sovereign immunity in place, the United States Government could not be sued. *Id.*

In 1946, Congress exacted the FTCA, waiving sovereign immunity for tortious conduct caused by government employees acting within the scope of the employment.  28 U.S.C. §§1346(b), 2401(b), 2671-2680. The purpose of the FTCA was two-fold: first, it provided compensation for the wrongdoings of government employees and, second, the legislation worked to deter tortious activity on behalf of the government while incentivizing proper supervision of government employees. *Loumiet v. United States*, 828 F.3d 935, 941 (D.C. Cir. 2016).

However, the FTCA was not Congress' first attempt to waive sovereign immunity. Beginning in 1887, Congress waived tort immunity on behalf of the federal government with respect to certain contract claims. *See* Jennifer L. McMahan and Mimi Vollstedt, *Researching the*

17

*Legislative History of the Federal Tort Claims Act,* United States Attorneys' Bulletin, Vol. 50 Number 1, 2011. The Tucker Act of 1887 memorialized that change and was one of the first steps by Congress to move away from the early practice of hearing private bills and deciding whether to provide compensation or to allow a case to escalate to a court. *Id.* Thereafter, the FTCA would go on to take on a variety of shapes before its official enactment in 1946. Congress would go on to introduce over thirty tort claims bills between 1925 and 1946 to address tort immunity. *Id.*

Historians note that during the time when Congress was contemplating FTCA enactment, there was fear amongst legislatures of "unwarranted judicial intrusion[s] into areas of governmental operations and policymaking." *Gray v. Bell,* 712 F.2d 490, 506 (D.C. Cir. 1983). To assuage these concerns, Congress "opted to explicitly preserve the United States' sovereign immunity from more than a dozen categories of claims." *See generally* 28 U.S.C. § 2680(a)-(n). As stated, these explicitly detailed FTCA exceptions demonstrate Congress' clear intent to limit the waiver of sovereign immunity to some government torts and not others. These articulate and plainly defined exceptions illustrate a thorough

contemplation of what the FTCA would and would not cover. *See U.S. v. Johnson*, 481 U.S. 681, 692 (1987) (Scalia, J., dissenting opinion) (stating "Congress specifically considered, and provided what it thought needful for, the special requirements of the military."). For the purposes of the instant matter, Congress not only failed to provide a waiver of sovereign immunity exemption for stateside, non-combatant (*e.g.*, medical negligence) claims brought by military servicemen during times of peace, it quite plainly excluded such an exemption.

The Supreme Court has laid the foundation for the plain language interpretation of the FTCA with cases like *Brooks v. United States*, a case in which an off-duty military service member was injured by a government employee in a traffic accident and sought recovery for personal injury under the FTCA. 337 U.S. 49 (1949). The *Brooks* Court, employing a plain language interpretation of the FTCA, explicitly declined to find that the FTCA's immunity exemptions applied to an off-duty member of the military. The *Brooks* Court concluded that the FTCA provided the District Court with subject matter jurisdiction over certain civil claims and, to the extent that Congress did not waive sovereign

immunity for certain claims, such exemptions were codified and written into the plain language of the statute:

> The statute [has] exceptions. None exclude petitioners' claims. One [exception] is for claims arising in a foreign country. A second excludes claims arising out of combatant activities of the military or naval forces, or the Coast Guard, during time of war. These and other exceptions are too lengthy, specific, and close to the present problem to take away petitioners' judgments. [] **It would be absurd to believe that Congress did not have the servicemen in mind in 1946, when this statute was passed. The overseas and combatant activities exceptions make this plain**.

*Id.* at 51 (emphasis added). The *Brooks* Court concluded that the FTCA was enacted to address the need for adjudication of all tort claims, and not just those claims brought by non-service members. *Id.*

Abiding by the words of the FTCA, as written, is of the utmost importance as it dictates whether countless service members, like Mr. Carter, receive the fair and just recovery they are seeking from the government. Construing the FTCA statute as written allows not only for just recovery but also allows for Congress' true intent to be fulfilled. When taking a plain meaning approach to statutory interpretation, it is important to recognize what language is present in writing and what language is intentionally absent. Appellants do not ask the Court to create a different meaning for the words it has before it or read into the

FTCA statute what is not there. Appellants simply ask the Court to apply the FTCA to the facts of this case as the legislature intended.

## C.  The *Feres* Doctrine Does Not Apply to Appellants' FTCA Claims.

As stated above, shortly after the enactment of the FTCA in 1946, the Supreme Court issued a series of opinions interpreting the Act.  In the first, *Brooks v. United States*, the Court permitted a servicemember to bring a claim against the United Sates, when the plaintiff was injured in a traffic accident on a public highway.  *Id.* ("The statute's terms are clear.  They provide for District Court jurisdiction over any claim founded on negligence brought against the United States.  *We are not persuaded that 'any claim' means 'any claim but that of servicemen.'*" (emphasis added)).  The Court permitted the *Brooks'* claims under the FTCA, as they were "dealing with an accident which had nothing to do with the *Brooks'* army careers, injuries not caused by their service except in the sense that all human events depend upon what has already transpired." *Id.* at 52.  In *dicta*, the Court wrote that it would rule differently had the negligence been incident to the plaintiffs' service.  *Id.*

This *dictum* turned *ratio decidendi* one year later, in *Feres v. United States*, 340 U.S. 135 (1950).  There, the Court held that a

plaintiff's decedent's estate and his widow were prohibited from bringing a wrongful death claim under the FTCA, when the decedent perished in a barracks fire. The Court premised its decision on three reasons or rationales: first, unlike the *Brooks* plaintiffs, the *Feres* plaintiff's injuries arose "in the course of activity incident to service." *Id.* at 146. Second, according to the Court, and concordant with the incident to service concept, is that aggrieved service people are generously compensated through the Veterans' Affairs benefits system.[4] *Id.* at 145 ("The compensation system, which normally requires no litigation, is not negligible…[t]he recoveries compare extremely favorably with those provided by most workman's compensation statutes."). This second reason the Court premised on the general notion underlying any compensation system: service people enter a "grand bargain" whereby

---

[4] Servicepeople injured or killed in the performance of their military duties are compensated under the Veterans' Benefits Act. 38 U.S.C. § 301, *et seq.*

they are guaranteed benefits in exchange for recourse in the courts.[5] *See id.* Such a "grand bargain" served the additional purpose of conformity of recourse for peripatetic service people, who otherwise would be "dependent upon geographic considerations over which they have no control and to laws which fluctuate in existence and value." *Id.* at 143. Third, and also concordant with the incident to service concept, is that the Court doubted that Congress intended for service members to be able to recover under both FTCA and Veterans Affairs benefits schemes. *Id.* at 144.

A final reason—apocryphally attributed to *Feres* by subsequent decisions yet is nowhere to be found in the *Feres* opinion itself—is that tort claims by service people would be detrimental to military discipline. *Cf. U.S. v. Johnson*, 481 U.S. 681, 690 (1987) ("*Feres* and its progeny indicate that suits brought by service members against the Government for injuries incurred incident service are barred by the *Feres* doctrine

---

[5] For discussion and historical overview of the "grand bargain" created by workers' compensation schemes in the United States, *see* Congressional Research Inst., *Workers' Compensation: Overview and Issues* (Feb. 18, 2020), available at https://sgp.fas.org/crs/misc/R44580.pdf; *see also* PAUL M. SANDLER AND JAMES K. ARCHIBALD, PLEADING CAUSES OF ACTION IN MARYLAND 1023-27 (2018) (reflecting the Comment to § 14.1 Workers' Compensation).

because they are the *types* of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness." (brackets, quotation marks, and citation omitted)), *with Feres*, 340 U.S. 135 (1950); *see also U.S. v. Johnson*, 481 U.S. 681, 699 (1987) (Scalia, J., dissenting) ("In sum, neither of the three original *Feres* reasons nor the *post hoc* rationalization of 'military discipline' justifies our failure to apply the FTCA as written.").

Four years after *Feres*, the Supreme Court decided *United States v. Brown*, and sustained the plaintiff's medical negligence claims. 348 U.S. 110 (1954). In *Brown*, the plaintiff's injury occurred after his honorable discharge, "while he enjoyed a civilian status," and the "damages resulted from a defective tourniquet applied in a veterans' hospital." *Id.* at 112. Thus, the Court held that *Brooks*, rather than *Feres*, controlled. *Id.*

In the decades following *Brooks*, *Feres*, and *Brown*, the Federal District and Courts of Appeal have dutifully and broadly applied *Feres* to preclude suits by active duty military personnel whose injuries arose incident to service. At the same time, these Courts have plainly stated

their regret in applying such draconian precedent and, near uniformly quoting Justice Scalia's renowned *Johnson* dissent, have unabashedly stated that *Feres* "was wrongfully decided and heartily deserves the widespread, almost universal criticism it has received." *See, e.g., Clendening v. United States*, 19 F.4th 421, 431 (4th Cir. 2021) ("However, despite the rampant criticism, the *Feres* doctrine still stands, and this Court is bound by it."); *see also, Appelhans v. United States*, 877 F.2d 309, 313 (4th Cir. 1989) (quoting J. Scalia's dissent and concluding that "the fact that the doctrine may in many cases lead to undeniably harsh results does not relieve this court of its obligation to apply precedent"); *see also Bozeman v. United States,* 780 F.2d 198, 200 (2d Cir. 1985) ("The *Feres* doctrine is a blunt instrument; courts and commentators have often been critical of it"); *see also LaBash v. U.S. Dep't of the Army,* 668 F.2d 1153, 1156 (10th Cir. 1982) ("Although many courts have expressed reservations about the continuing validity of the broad *Feres* doctrine, only the United States Supreme Court can overrule or modify *Feres.*"); *see also, Perez v. Puerto Rico Nat. Guard*, 951 F. Supp. 2d 279, 296 (D.P.R. 2013) (quoting J. Scalia's dissent and stating "[w]e join the chorus of higher courts and renowned jurists who have

vehemently expressed their disdain for the unbridled *Feres* doctrine");
*see also, Smith v. Saraf*, 148 F. Supp. 2d 504, 508 (D.N.J. 2001) (quoting
J. Scalia's dissent); *see also Cummings v. Dep't of Navy*, 116 F. Supp. 2d
76, 79 (D.D.C. 2000), *rev'd sub nom. Cummings v. Dep't of the Navy*, 279
F.3d 1051 (D.C. Cir. 2002) (quoting J. Scalia's dissent and stating that
"this Court agrees" with his criticism); *see also Siddiqui v. United States*,
No. 17-13351, 2018 WL 6178983, at *4 (E.D. Mich. Nov. 27,
2018), *aff'd,* 783 F. App'x 484 (6th Cir. 2019) (quoting J. Scalia's dissent
and bemoaning that since *Feres*, a "judicially-engineered exception to the
FTCA[,]" service members "suffering even the most brutal injuries due to
military negligence have been shut out of the courts"); *see also, Bosh v.
United States*, No. C19-5616 BHS, 2019 WL 6728636, at *1 (W.D. Wash.
Dec. 11, 2019), *aff'd,* 831 F. App'x 834 (9th Cir. 2020) (quoting J. Scalia's
dissent and regretting that "*Feres*, however, is the law of the land"); *see
also, Fianko v. United States*, No. PWG-12-2025, 2013 WL 3873226, at
*6 (D. Md. July 24, 2013) (quoting J. Scalia's dissent).

Here, this Court need not join its sisters' grudging application of
unjust precedent, nor echo their general repudiation of that doctrine,
because *Feres* neither applies to, nor bars Mr. Carter's claims. The three

*Feres* rationales, and the *ex post hoc* rationale of military discipline, are simply not implicated by the facts of this case. The reasons why are simple and facially obvious. First, there is no dispute that Mr. Carter's active duty period originally ended on March 13, 2018, and there is no dispute that, at the time of Mr. Carter's surgery on April 6, 2018, and his subsequent injury, he was not on active duty status. Second, Mr. Carter has not been "generously compensated" through the Veterans Affairs benefits system. Third, case law prior to and subsequent to *Feres* permits recovery under both the FTCA and VAB. Finally, Mr. Carter's medical negligence claims do not impute military discipline or sensitive military matters. Like the *Brown* plaintiff, Mr. Carter's injuries occurred not in the line of duty, but in a stateside hospital setting, where Mr. Carter's only role was that of a surgical patient. 348 U.S. at 112. And like the *Brooks* plaintiff, the negligence in Mr. Carter's case "had nothing to do with [his National Guard] career[, and his], injuries [were] not caused by [his] service except in the sense that all human events depend upon what has already transpired." 337 U.S. at 52.

1.   **Mr. Carter's Claims and Injuries Were Not Incident to Service as He Was Inactive Duty and Under Compulsion of No Orders While Undergoing an Elective Surgical Procedure at a Government Hospital.**

Mr. Carter's injuries were not *incident to service*.  While there is "no specific element-based or bright line rule for determining whether certain conduct was incident to service," no matter how one construes this "broad and amorphous" jurisdictional threshold, Mr. Carter's claims pass muster.  *Clendening*, 19 F.4th at 427-28 (citations omitted).

The Fourth Circuit recently opined on the incident to service test, in *Clendening v. United States.  Id.* at 427-31.  The Court explained that "the 'focus' of the *Feres* doctrine 'is not upon when the injury occurs or when the claim becomes actionable, rather it is concerned with when and under what circumstances the negligent act occurs.'"  *Id.* at 428 (quoting *Kendrick v. United States*, 877 F.2d 1201, 1203 (4th Cir. 1989).  Accordingly, "[w]hile considerations such as the duty status of the service member, whether the injury took place on base, and what activity the service member was engaged in at the time are relevant, they are not always determinative."  *Id.* (citing *Aikens v. Ingram*, 811 F.3d 643, 651 (4th Cir. 2016).  The *Clendening* Court clarified that the incident to service test "does not inquire whether the discrete injuries to the victim

28

were committed in support of the military mission." *Id.* (citation omitted).

The plaintiff's decedent in *Clendening* was injured by "exposure to contaminated water and environmental toxins while stationed at the Marine Corps Base Camp Lejeune in Jacksonville, North Carolina." *Id.* at 425. The plaintiff's wife brought a wrongful death action alleging negligence and failure to warn, claiming that the water on base was contaminated with fuel, Strontium 90 (a radioactive substance), benzene, and other hazardous substances, of which the government was aware and for which the Environmental Protection Agency and the Department of Health and Human Service's Agency for Toxic Substances had issued various reports. *Id.* at 425-26. The government moved to dismiss under *Feres*, as the Appellee did in the instant case.

The *Clendening* plaintiff argued that her claims were "not incident to any military project" because the plaintiff's decedent's "exposure was not incident to any military project and because the government's conduct served no military purpose." *Id.* at 427 (brackets, quotation marks, and citation omitted). The Fourth Circuit rejected plaintiff's argument, comparing the circumstances to *Feres*: in both cases, "death

allegedly resulted from unsafe living conditions on base." *Id.* at 428. The plaintiff's decedent's "death occurred in the course of his day-to-day, active duty service while on base at Camp Lejeune." *Id.* His injuries "thus stemmed from the relationship between [him] and his service in the military." *Id.* The fact "that Clendening was not specifically ordered to handle contaminants or that the Government has articulated no strategic military purpose for exposing Clendening to dangerous substances [wa]s irrelevant." *Id.* at 429. Further, "the military's provision of water and accommodations to its troops [wa]s clearly activity 'incident to service.'" *Id.* at 428 (citation omitted).

The *Clendening* Court pointed out that courts have found a myriad of activities to be *incident to service*: "enjoying a drink in a noncommissioned officers club[;]" "riding a donkey during a ballgame sponsored by the Special Services division of a naval air station[;]" and "swimming in a swimming pool at an airbase." *Id.* (quoting *Hass for Use & Benefit of US v. United States*, 518 F.2d 1138, 1141 (4th Cir. 1975)).

The plaintiff in *Clendening* additionally argued that her case was more akin to *Brooks.* The Fourth Circuit rejected that argument as well, distinguishing Clendening's circumstances from those of *Brooks*: "the

30

surviving *Brooks* brother was on furlough at the time of the accident and 'under compulsion of no orders or duty and on no military mission'. . . a "vital distinction[.]" *Id.* at 430 (quoting *Feres*, 340 U.S. at 146). "By contrast, at the time of Clendening's exposure, he was on active duty status and stationed on base due to his position as a Marine Corps officer." *Id.*

Applying the lessons of *Clendening* to the instant case plainly demonstrates that Mr. Carter's injury was not *incident to service*. Unlike the *Clendening* plaintiff's decedent, and the plaintiff in *Feres*, Mr. Carter was not on active duty when injured, having recently transitioned to inactive duty status on March 13, 2018. And, unlike the *Clendening* and *Feres* plaintiffs, Mr. Carter was not injured on base while carrying out a military mission. Rather, he was injured in the operating room of a government hospital that caters to servicemembers, their families, and military veterans alike. Mr. Carter was traumatically injured while undergoing an elective spine surgery, sedated and unconscious, and in the care of trained medical professionals. Thus the "vital distinction" between Mr. Carter's injuries and those claimed in actions barred by the *Feres* doctrine is that, at the time of his injury, Mr. Carter was "under

compulsion of no orders or duty and on no military mission." *Id.* at 430 (quoting *Feres*, 340 U.S. at 146).

> ### 2. Mr. Carter was an Inactive Duty Reservist Injured Off-Base, While Unconscious Under General Anesthesia for an Elective Surgery.

At the time of his injury on April 6, 2018, Mr. Carter was an inactive duty member of the Air National Guard. As such, he was required to "(1) assemble for drill and instruction, including indoor target practice, at least 48 times each year; and (2) participate in training at encampments, maneuvers, outdoor target practice, or other exercises, at least 15 days each year." 32 U.S.C. § 502(a); *see also* 38 U.S.C. § 101(23) (defining "inactive duty training . . . [i]n the case of the . . . Air National Guard of Any State" as that falling under section 316 and 502, *et seq.*). Notwithstanding arguments concerning the validity and viability of the judicially-engineered *Feres* bar, Appellants readily concede that had Mr. Carter been injured as a result of negligent conduct that occurred during one of his 63 days of training and field exercise, the government may have a stronger argument under *Feres*. But that is not the case here. Mr. Carter was inactive at the time of his April 6, 2018 injury.

32

Critically, Mr. Carter's spinal cord injury was not suffered at a military base, or at a military-sponsored event, or because of the military's provision of dangerous substances. Mr. Carter's spinal cord injury occurred in connection with an elective surgical procedure during which it is alleged that an orthopaedic spine surgeon deviated from the standards of care in negligently placing a spinal disc spacer, permanently traumatizing and injuring Mr. Carter's spinal cord. At the time of the negligence and injury, Mr. Carter was sedated, unconscious, and immobile, lying on an operating room table, in a surgical suite. His surgery, comprising one single day of Mr. Carter's life, certainly did not "occur in the day-to-day, active duty service[.]" *Clendening*, 19 F.4th at 428. And unlike the provision of water in *Clendening*, the barracks fire in *Feres*, or the military-sponsored, on-base recreational activities in *Hass for Use & Benefit of U.S.*, Mr. Carter's supine and unconscious *lack* of activity cannot reasonably be said to be *incident to service*. *Clendening*, 19 F.4th at 428 (citing *Aikens v. Ingram*, 811 F.3d 643, 651 (4th Cir. 2016) for the proposition that "the duty status of the service member, whether the injury took place on base, and what activity the service member was engaged in" are relevant considerations).

33

Consistent with Mr. Carter's argument that his medical negligence claims were not *incident to service*, and therefore not subject to *Feres*, the Federal Circuits and the Supreme Court have many times sustained medical negligence claims brought by non-active duty service members. In the *Brown* case, the Supreme Court held that a claim for severe nerve damage resulting "from a defective tourniquet applied in a veterans' hospital" was not barred by *Feres*. 348 U.S. at 112. In *Bradley v. United States*, the Fourth Circuit reversed summary judgment on a wrongful death claim where the plaintiff alleged an off-duty servicewoman died of infection after medical staff repeatedly refused her treatment. 161 F.3d 777, 778-82 (4th Cir. 1998). In *Cortez v. United States*, the Fifth Circuit reversed the lower court's dismissal under *Feres*, when the plaintiff alleged medical negligence against an army medical center psychiatric facility, where the plaintiff's decedent, on the Temporary Disability Retired List—not active duty—was left unattended on the 8th floor and jumped to his death. 854 F.2d 723, 727 (5th Cir. 1988). Mr. Carter was not active duty, he was under no military or medical orders, and he was not engaged in an activity implicating the military or military service—

as he was fully unconscious while under the knife—and thus his claims are not barred under *Feres*.

**D.    The Rationales Underpinning the *Feres* Doctrine and the Incident to Service Test Have Been Discarded by the Supreme Court and Do Not Apply to Appellants' Claims.**

The Supreme Court in *Feres* initially articulated several "rationales" in defense of its judicially-engineered *incident to service* test which were predicated on the "distinctly federal" relationship between the United States and its service personnel, on the presence of an alternative military compensation system, and on the fear of damaging the military disciplinary structure.    *See generally, Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 671-72 (1977). *See also, Davis v. United States,* 667 F.2d 822, 825 (9th Cir. 1982); *Lewis v. United States,* 663 F.2d 889, 890 (9th Cir. 1981); *Hunt v. United States,* 636 F.2d 580, 597 (D.C. Cir. 1980).    As this Court will see, the rationales underpinning the *Feres* doctrine are not implicated in this case and, in turn, the *Feres* doctrine is not applicable.

**1.    The "Distinctively Federal Relationship" Rationale Has Been Discarded by the Courts and No Longer Controls.**

The first reason the *Feres* Court gave for barring claims of service members relates to the idea that the FTCA applies the "law of the place

35

where the act or omission occurred," 28 U.S.C. 1346(b), and that Congress could not have intended for local tort law to control issues that are federal in nature. 340 U.S. at 142-44. The *Feres* Court believed that Congress would have wanted uniformity of law in situations involving military servicemembers and was primarily concerned with the "*unfairness to the soldier* of making his recovery turn upon where he was injured, a matter outside of his control." *Johnson*, 481 U.S. at 693 (citations omitted) (emphasis in original).

This first *Feres* rationale was discredited and put to rest years ago in *United States v. Shearer* when the Supreme Court held that the "distinctively federal" rationale was "no longer controlling." 473 U.S. 52, 58, n. 4 (1985). In fact, this rationale has not been a viable rationale for *Feres* since the Supreme Court discarded it in *United States v. Muniz*, 374 U.S. 150 (1963). Justice Scalia appropriately pointed out in his *Johnson* dissent that "[t]he unfairness to servicemen of geographically varied recovery is...an absurd justification, given that...nonuniform recovery cannot possibly be worse than (what *Feres* provides) uniform nonrecovery." 481 U.S. at 695-96 (citing *Muniz*, 374 U.S. 150, 162).

36

### 2.    Mr. Carter Benefits From No "Grand Bargain."

The second reason the *Feres* Court gave for excepting military personnel from the right to bring suit under the FTCA is that the Veterans Benefits Act ("VBA") compensates service members.  In so concluding, the Supreme Court violated the maxim "absence of evidence is not evidence of absence," as pointed out by Justice Scalia in his *Johnson* dissent: "*Feres* described the absence of any provision to adjust dual recoveries under the FTCA and VBA as 'persuasive evidence that there was no awareness that the Act might be interpreted to permit recovery for injuries incident to miliary service.'"  *Johnson*, 481 U.S. at 697 (Scalia, J., dissenting) (quoting *Feres*, 340 U.S. at 144-45).

Also pointed out by Justice Scalia, such a prohibition is inconsistent with the FTCA—the text of which, among clearly articulated exceptions, does not include an exception for related VBA claims—as well as prior and subsequent case law, which has permitted FTCA claims when the plaintiff also received VBA benefits.  In the *Brooks* case, the Supreme Court plainly stated: "nothing in the [Federal] Tort Claims Act or the veterans' laws . . . provides for exclusiveness of remedy," and the Court refused to "call either remedy . . . exclusive . . . when Congress has not

done so." 337 U.S. at 53; *see also, Johnson*, 481 U.S. at 697 (Scalia, J., dissenting) (stating the same). In *Brown*, the Court also stated that "Congress had given no indication that it made the right to [VBA] compensation the veteran's exclusive remedy, . . . the receipt of disability payments . . . did not preclude recovery under the [Federal] Tort Claims Act." 348 U.S. at 111; *see also Johnson*, 481 U.S. at 698 (Scalia, J., dissenting) (stating the same). The Court in *Brooks* and *Brown* were not looking to sidestep the principles of statutory interpretation and followed the plain meaning to the FTCA statute.

Mr. Carter walked into a government hospital on April 6, 2018, and then never walked again. He can remember his very last steps—into a government facility where substandard surgical care robbed him of his independence—his ability to use his legs, arms, and hands, to toilet and bathe on his own. Certain aspects of Mr. Carter's medical care are likely covered by his VBA benefits. But well-known systemic problems with the veterans' health care system, including quality and access issues, preclude Mr. Carter from receiving the care he so desperately requires

and deserves.[6]   Further, the true cost of his traumatic spinal cord injury—the loss of his livelihood, his ability to parent and to be a husband to his wife—are simply not addressed by the VBA.

### 3.  Only One Legitimate *Feres* Rationale Remains: The Evolution and Refinement of the *Feres* Rationales and the *Post Hoc* Rationalization of Military Discipline.

Over the course of the years that followed *Feres*, lower courts realized that, when applied, the *Feres* doctrine is, in effect, a license for tortious conduct and a mandate of second-class citizenship for military servicemen. The Supreme Court did not take the causal effect of *Feres* lightly and in subsequent cases refined the foundations of the doctrine,

---

[6] Sources too numerous for these pages abound, but here are a sampling: Dana Montalto, *Op. Ed.: How the VA has Illegally Denied Healthcare to Thousands of Veterans*, LOS ANGELES TIMES (May 13, 2021), available at https://www.latimes.com/opinion/story/2021-05-31/veterans-healthcare-denied-access; *see also* Patricia Kime, *Leadership Hasn't Done Enough to Protect Patients at the VA, Watchdog Says*, MILITARY.COM (Oct. 27, 2021), https://www.military.com/daily-news/2021/10/27/leadership-hasnt-done-enough-protect-patients-va-watchdog-says.html; Jill Castellano, *The Mission Act is Supposed to Help US Veterans Get Health Care Outside the VA.  For Some, It's Not Working*, USA TODAY (Nov. 1, 2021), available at https://www.usatoday.com/in-depth/news/investigations/2021/11/01/mission-act-aid-veterans-healthcare-va-isnt-letting-it/; Judy Woodruff, *Reports Highlight Failures of the VA's Health System During the Pandemic*, PBS NEWS HOUR (Jan. 1, 2021), available at https://www.pbs.org/newshour/show/reports-highlight-failures-of-the-vas-health-system-during-the-pandemic.

announcing that the doctrine "seems best explained" by only one of the initially articulated rationales—what has now become known as the "military discipline rationale" and it observed that the other rationales advanced in the past as support for the *Feres* doctrine were "no longer controlling." *Brown,* 348 U.S. at 112; *Muniz,* 374 U.S. at 162 (1963); *Chappell v. Wallace,* 462 U.S. 296, 299 (1983); *Shearer,* 473 U.S 52, 87 L.Ed.2d at 44 n. 4.

The Supreme Court further noted that "[t]he *Feres* doctrine cannot be reduced to a few bright-line rules" and that the *Feres* bar should be erected only where "the suit requires the civilian court to second-guess military decisions...and...the suit might impair essential military discipline." *Id.* The Supreme Court also stated that the *Feres* doctrine barred the "*type* of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness." *Id.* at 45 (emphasis in original). There is not even a hint in the *Shearer* Court's opinion that its application of the *Feres* doctrine turned in any way upon the mere fact that the plaintiff was a serviceman, and the defendant was the Government—a fact that speaks

40

to the heart of the Government's *military status* and *incident to service* arguments in the case at bar.

With the Supreme Court's lead, lower courts directed their focus on the *reasons* underlying the *Feres* doctrine, and began declining to erect the *Feres* bar when the primary rationale which "serves largely if not exclusively as the predicate for the *Feres* doctrine" was not implicated by the facts of the particular case. *Hunt v. United States,* 636 F.2d 580, 599 (D.C. Cir. 1980); *see also, Scales v. United States,* 685 F.2d 970, 973 (5th Cir. 1982), *cert. denied,* 460 U.S. 1082 (1983) ("*Stencel* and its progeny direct our inquiry to the manner in which the policies underlying *Feres* are affected—specifically the impact on military discipline—rather than to the status of the claimant").

### 4. Appellants' Medical Negligence Claims Do Not Impute Military Discipline.

Post-dating *Feres* by decades, yet wrongfully attributed to the doctrine, "the *post hoc* rationalization of military discipline"—even if it were valid—would not preclude Mr. Carter's claim. *Johnson*, 481 U.S. at 699 (Scalia, J., dissenting). This "rationalization" is premised on the notion that service members' suits under the FTCA would undermine military discipline "and civilian courts would be required to second-guess

military decisionmaking." *Id.*  Accordingly, to satisfy this dubious test, Courts "must ask whether particular suits would call into question military discipline and decisionmaking and would require judicial inquiry into, and hence intrusion upon, military matters." *Clendening*, 19 F.4th at 427 (quoting *Cioca v. Rumsfeld*, 720 F.3d 505, 515 (4th Cir. 2013)) (brackets and quotation marks omitted).

In justifying the military discipline rational, Courts interpreting *Feres* have endeavored to identify the type of activities which could harm the military's disciplinary system if litigated in a civil action.  In doing so, Courts identified two distinct ways in which military discipline could be impeded by the possibility of civil suits concerning activities bearing a strong relationship to military affairs.  First, military decision-makers subject to civil suit "might not be willing to act as quickly and forcefully as is necessary, *especially during battlefield conditions*," if their actions could be second-guessed in a civilian court." *Jaffee v. United States,* 663 F.2d 1226, 1232 (3rd Cir. 1981) (emphasis added). *See also, Stencel,* 431 U.S. at 673.  Second, encouraging military personnel to question decisions by their superiors might have some effect on the willingness of

such personnel to follow orders. *See, e.g., Jaffee,* 663 F.2d at 1232; *Hunt,* 636 F.2d at 599.

Here, Mr. Carter's elective spine surgery while on inactive duty status, his resulting spinal cord injury, and the civil claims that naturally followed, do not involve military matters or military discipline. Mr. Carter's medical negligence claims do not implicate a military decision-maker's willingness to "act quickly and forcefully…during battlefield conditions," nor will they have any impact on the "willingness of [military] personnel to follow orders." *Jaffee,* 663 F.2d at 1232; *Stencel,* 431 U.S. at 673; *Hunt,* 636 F.2d at 599.

Mr. Carter's leaders and colleagues in the Air National Guard had no say, and no interest in his elective surgery. The surgery was not related in any way to his duties and responsibilities—active, inactive, reservist, or otherwise. *See* 32 U.S.C. § 502(a); *see also* 38 U.S.C. § 101(23). Mr. Carter was not under any medical orders to undergo surgery. He elected to have surgery, after discussion with his medical providers, spouse, and family. Indeed, his medical records are rife with notes stating that his practitioners "obtained informed consent" for his elective and corrective procedures. Mr. Carter *consented* to surgery; he

was not *ordered* to undergo surgery.  He was not *duty-bound* to undergo surgery.

Further, Mr. Carter was not active duty, but rather, inactive duty. By definition, his injuries did *not* occur "in the course of his day-to-day, active duty service[,]" and thus his injuries *did not* "stem from the relationship between [him] and his service in the military." *Clendening*, 19 F.4th at 428 (brackets omitted).

Lastly, Mr. Carter was not injured on a military base.  Unlike the plaintiffs in *Feres* and *Clendening*, where the general functioning of the military, in its provision of barracks, water, or some other essential element of military function, was implicated, Mr. Carter was injured in a government hospital.  As discussed, the Federal Courts and Supreme Court have not considered medical negligence in a hospital setting to bar claims under the FTCA. *See generally, Brown*, 348 U.S. at 112; *see also, Bradley v. United States*, 161 F.3d 777, 778-82 (4th Cir. 1998); *Cortez v. United States*, 854 F.2d 723, 727 (5th Cir. 1988).

In short, where there is no relevant relationship between a service member's actions or behavior and the military's interests that might be jeopardized by civil suits, the *Feres* doctrine should not bar recovery.

44

### E.    *Feres* Was Wrongfully Decided and Should Be Overruled.

*Feres* directly conflicts with the FTCA and has outgrown its purpose and utility.  Even the lone remaining rationale underpinning *Feres*—military discipline—is inadequate to justify the widespread injustice and inequity caused by its arbitrarily disparate and hazardous application.

For the reasons set forth in Justice Scalia's dissent in *United States v. Johnson*, 481 U.S. 681, 691-703 (1987), *Feres* should be overruled. "*Feres* was wrongfully decided and heartily deserves the widespread, almost universal criticism it has received." *Id.* at 700; *see also*, *Daniel v. United States*, 139 S.Ct. 1713 (2019) (Thomas, J., dissenting from denial of certiorari and stating that "[s]uch unfortunate repercussions—denial of relief to military personnel and distortions of other areas of law to compensate—will continue to ripple through our jurisprudence as long as the Court refuses to reconsider *Feres*.") (internal citations omitted).

The Fourth Circuit itself has not hesitated to point out the flaws and shortcoming of the *Feres* doctrine, though it is bound by the decision. *See, e.g., Clendening v. United States*, 19 F.4th 421, 431 (4th Cir. 2021) ("However, despite the rampant criticism, the *Feres* doctrine still stands,

45

and this Court is bound by it."); *see also, Appelhans v. United States*, 877 F.2d 309, 313 (4th Cir. 1989) (quoting J. Scalia's dissent and concluding that "the fact that the doctrine may in many cases lead to undeniably harsh results does not relieve this court of its obligation to apply precedent").

Because *Feres* was engrafted upon the FTCA by the Court, rather than Congress, Courts should address the multitude of problems and inequities that have arisen from the decision. "Revisiting precedent is particularly appropriate where, as here, a departure would not upset expectations, the precedent consists of judge-made rule…, and experience has *pointed* up the precedent's shortcomings." *Kimble v. Marvel Entm't, LLC*, 135 S.Ct. 2401, 2417 (2015) (Alito J., dissenting); *see also*, *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (2022) (explaining and justifying the revisitation and overruling of precedent). The tides are changing and now is the appropriate time to revisit and overrule *Feres*. For failure to act will only serve to renew and validate the government's unbridled license for tortious conduct and otherwise mandate second-class citizenship to some of our country's most honored and revered citizens—our military servicemembers, veterans, and their

families.  Stated otherwise, "[o]ur citizens in uniform may not be stripped of basic rights simply because they have doffed their civilian clothes." *Chappell v. Wallace*, 462 U.S. 296, 304 (1983) (citing E. Warren, *The Bill of Rights and the Military*, 37 N.Y.U.L.Rev. 181, 188 (1962).

## CONCLUSION

For the reasons set forth above, Appellants respectfully submit that the District Court's Order and Judgment of May 24, 2022, should be reversed and this case should be remanded back to the District Court for further proceedings on the merits.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellants respectfully request that this Court hear oral argument in this case.  This appeal raises serious issues regarding the rationales, interpretation, and widespread application of the *Feres* doctrine and its direct conflict with the plain language of the Federal Tort Claims Act.

s/ Christopher T. Casciano
Christopher T. Casciano
Brian S. Brown
Kristin R. Hosseinzadeh
Alexis I. Gbemudu
BROWN & BARRON, LLC
7 Saint Paul Street, Suite 800
Baltimore, MD 21202
410-547-0202

47

## CERTIFICATE OF COMPLIANCE

In accordance with Rules 32(a)(7)(B) and (C) of the Federal Rules of Appellate Procedure, undersigned counsel for Appellants hereby certify that the accompanying brief is printed in 14 point typeface, with serifs, and, including footnotes, contains no more than 13,000 words. According to the word-processing system used to prepare the brief, Microsoft Word, it contains <u>9541</u> words.

Dated:  August 10, 2022

s/ Christopher T. Casciano
Christopher T. Casciano